Filed 1/8/14  P. v. Gonzales CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B244935 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA119346) |
| v. | |
| FREDRICK GONZALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert J. Higa, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Fredrick Gonzales appeals from the judgment entered upon his conviction by jury of two counts of lewd acts with a child under the age of 14 (Pen. Code, § 288, subd. (a)).[1] Appellant contends the prosecutor committed prejudicial misconduct requiring reversal of the judgment.

We find no error and affirm.

## FACTS

### 1. Procedural Background

Appellant was charged by amended information with four counts of committing lewd acts on a child between September 1, 2001 and June 1, 2002. The jury found appellant guilty on counts 2 and 3, and not guilty on count 4. The jury was deadlocked on count 1. The trial court declared a mistrial as to that count and it was dismissed. Appellant brought a motion for new trial based in part on prosecutorial misconduct. The trial court denied the motion. The trial court sentenced appellant to the low terms of three years on counts 2 and 3 and ordered them to run concurrently.

### 2. Prosecution Evidence

C. G. is appellant's half sister. They have the same father but different mothers. C. testified that when she was a child she lived in a three bedroom house with appellant, her sister Emily G., her brother Francisco, her aunt Cathy, her uncle Ralph, and her grandparents. C. and Emily shared a bedroom. Appellant and Francisco slept in the den. On January 25, 2011 C. reported to law enforcement that appellant performed lewd acts on her between September 1, 2001 and June 1, 2002. Appellant was 19 years old at the time of the incidents described herein.[2] C. was in the fifth grade and was 11 years old.

C. was cleaning her bedroom when appellant walked in and closed the bedroom door. Appellant guided C. to the bed and started rubbing her vagina over her clothes. He

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     Only the facts pertaining to counts 2 and 3 for which appellant was convicted are presented here.

then rubbed her vagina under her clothes, pulled her shorts down and orally copulated her. Appellant stopped after a few minutes, laid on the bed and masturbated. He told C. to "get on" but she said no, and left the room.

On another occasion C. was sleeping in her bedroom with her sister Emily. C. woke up because she felt someone touching her. Appellant fondled her over her clothing and then C. felt his fingers go under her clothing. She tried but was unable to wake up Emily and she turned away from appellant so that he could not touch her. Appellant stopped and then crawled out of the bedroom.

Evidence of two additional incidents where appellant performed sexual acts on C. against her will was introduced at trial under Evidence Code section 1108. The incidents occurred prior to the charged offenses. On one occasion when they were sitting next to each other watching television in the den, appellant told C. to pinch his nipples. C. pinched one of appellant's nipples even though she did not want to do it. She felt she had to do it because appellant was much bigger than she. When their grandmother walked into the den appellant told C. to stop. Appellant told their grandmother that he did not know why C. was touching him. On another occasion appellant asked C. to stay in the pool after everybody else got out. Appellant sat on the pool step beside C. and fondled her over her bathing suit. C. testified that appellant had fondled her "probably twenty times" prior to the incidents when she was in the fifth grade.

C. did not report the incidents involving appellant to anyone until after her grandfather passed away. In January 2011, while at her boyfriend Manuel's house, C. told Manuel about her relationship with appellant and why she had a conflict with him. C. told Manuel what appellant did to her because "brothers don't do certain things to their sister." The same day, C.'s father Fredrick, her younger brother Francisco, her older half brother Robert, and appellant, drove to Manuel's house to pick up C.. Appellant remained in the car with Fredrick while Robert and Francisco went inside. Robert got very upset when C. told him that appellant inappropriately touched her. He became angry when he went outside and did not want C. to be in the car with appellant. Robert

3

told appellant, "you walk. You walk." Fredrick asked appellant, "what's going on?" Appellant stated that C. was lying. C. had not revealed the allegations of sexual abuse to appellant or her father prior to appellant's statement. Upon arriving at her grandmother's house, C. told her aunt Cathy and her grandmother that, in the past, appellant touched her inappropriately. They told her that she should have said something when her grandfather was still alive because he "would have done something about it." C. told them that her uncle Ralph also molested her in his car when she was in the sixth grade. C. felt that her father, her aunt, and her grandmother did not believe her. She packed her "stuff" and moved in with Robert. C. needed time to "take it all in" and after a few days reported the incidents to law enforcement because she "felt that it was the right thing to do."

Emily was having lunch with her boyfriend when she received a call from her aunt Cathy who asked her if uncle Ralph had ever touched her inappropriately. Emily was unaware of what had happened earlier at her grandmother's house. Cathy relayed to Emily that C. told the family that appellant had sexually assaulted her in the past. Emily told Cathy that Ralph had not touched her inappropriately but that appellant had molested her two or three times when she was about seven or eight years old. The incidents occurred when Emily and C. had to sleep in the den because family from out of town were visiting and using their bedroom. On two separate occasions appellant laid down next to Emily and placed his fingers inside her vagina. Emily stretched and moved and appellant quickly pulled his fingers out and left. On another occasion, appellant laid down next to Emily and took her hand and placed it on his penis. Emily pretended to stretch and yawn and pulled her hand away.

Emily did not say anything about appellant touching her inappropriately until C. came forward with her accusations. She did not want to be "blamed for anything" and she acted "like it never happened" because she wanted to show that her family "was perfect." C. and Emily both testified that since they revealed the allegations of appellant's sexual abuse, appellant's side of the family "turned their back" on them.

4

Whittier Police Detective Kenneth Woods interviewed C. and Emily. Detective Woods was assigned to the Sex Crimes Unit and had conducted in excess of 150 sexual assault investigations. He testified that it was common for victims of child molestation to delay reporting the incidents. He testified that while C. had been inconsistent on the order in which the incidents happened, she was consistent in describing the details of the incidents she alleged.

### 3.    Defense Evidence

Several of appellant's family members, including his mother and grandmother, testified that appellant did not live at his grandparents' house with C. during the time period in which the charged incidents occurred. Appellant's mother testified that appellant and his girlfriend lived with her in a different city and produced documentation to support her claim. She produced a driver's license for appellant's girlfriend that was issued on December 14, 2001, and appellant's W-2 tax form which indicated that he made $27 for the year 2002.

Appellant's grandmother testified that she and her husband loved appellant "dearly" and "loved him like a son because he was always" with them. Several family members testified that appellant kept clothes at his grandmother's house but appellant's grandmother testified that he never spent the night at her house and that he only visited her house on two occasions during the one-year time period in which the incidents occurred. She also testified that prior to C. making the allegations against appellant she told C. and Emily that appellant would inherit her house when she died and that they would not be inheriting anything from her estate. At the time of trial, there was no will showing the grandmother's intent and there had been no disputes over inheritance.

Several witnesses opined that C. was not a truthful person and that she had a reputation for lying. One witness said she was "a liar and manipulative," another said she told "lies," and another said "she fibs." C.'s father Fredrick testified that on two different occasions she falsely accused someone of inappropriately touching her.

5

Several witnesses testified to appellant's good character and reputation, and that he had been around other children without incident. A psychological evaluation prepared by Dr. Jennifer Bosch indicated that appellant's highest sexual interest group was adolescent females, ages 14 to 18. Dr. Busch opined that this was considered normal because it was not indicative of attraction to prepubescent children. She acknowledged that she had no way of verifying the veracity of appellant's statements during the assessment, and that her assessment was relevant to appellant's current age of 29, and not when appellant was 18 years old when it was alleged he committed the crimes.

### 4. Prosecution's Rebuttal

C. denied making false accusations and telling her father that someone had inappropriately touched her. The prosecution introduced a recording of a telephone call between C. and appellant, in which she accused him of sexually molesting her. C. told him that she wanted to hear him say he was sorry. She said she was attending counseling and wanted to put everything behind her. Appellant responded, "Well put it behind you. I mean, it's behind me." Appellant said he forgave C. for him being in jail and explained "I respect whatever it is that I did to you that makes you the way you are or whatever then you know, I hope that you forgive me." When C. told appellant that she could not move on until he expressed remorse, he responded, "Well this is the best you can get. I mean it's that I forgive you and I hope you forgive me and . . . ."

### DISCUSSION

*Contention*

Appellant contends that the prosecutor committed prejudicial misconduct during rebuttal argument. Appellant argues that the prosecutor "suggested to the jury that there were documents or exhibits that had been generated, but that were not admitted into evidence, of which counsel for both sides were aware, that somehow conclusively proved that the prosecution's witnesses were telling the truth." Appellant also argues the prosecutor's remarks impugned defense counsel's integrity by implying that defense counsel tried to deceive the jury.

6

*Applicable Law*

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*Ibid.*)

*Proceedings Below*

In her rebuttal argument, the prosecutor focused on the defense theory that C. made up the accusations against appellant and that both she and her sister were liars. The prosecutor stated "this is a case about credibility of the witnesses. If you believe Emily, if you believe C., and what they have to say, you have enough to convict." The prosecutor discussed the jury instruction on evaluating the credibility of witnesses (CALJIC No. 2.20) and stated that C. and Emily answered the questions in a straightforward manner. She continued, "When I asked them the question basic questions, where do you live? Who do you live with? What happened to you, et cetera; very basic. We're not hiding the ball on anything, it's just a question. What can you tell the jury, because this is the first time that you are hearing the evidence. The defense attorney and I, we both know what happened in this case based upon everything that is generated . . . ." Defense counsel objected and the trial court overruled the objection.

The prosecutor continued, "Um, I [] lost my train of thought. I'm sorry. Um, the way that these girls testified in court . . . is very truthful. I was telling you that when I asked them a question, they answered it directly. As jurors you are hearing the

7

information firsthand, so it's very new to you." The prosecutor further argued that C. and Emily had no motive to lie and their accounts of what occurred were not embellished or exaggerated. The prosecutor asked the jury to remember the instruction on the use of evidence of other sexual acts that appellant committed (CALJIC No. 2.50.01) and urged the jury to follow the law and find appellant guilty. At this point the trial court ordered a break for lunch and defense counsel renewed her objection outside the presence of the jury. Defense counsel stated that her specific objection was to the prosecutor's statement that "the defense attorney and [the prosecutor] know what really happened in this case, we know what the facts are." The trial court responded, "Well, in a way she could be bolstering your argument as to everything you said too; right? It cuts either way, but I didn't hear . . . ."

After appellant was found guilty, defense counsel moved for a new trial, arguing among other grounds that the prosecutor's rebuttal argument was improper and constituted misconduct. The trial court denied the motion. Specifically addressing the prosecutorial misconduct argument, the court stated, "I had our reporter transcribe that portion and I read and reread that, and after considering the language there I do not think this really amounts or reaches the level of prosecutorial misconduct."

*Analysis*

As with most child molestation cases, the issue was credibility. The vast majority of argument of both defense counsel and the prosecution consisted of a series of attacks on the credibility and character of witnesses. Here, the prosecutor's comments were grounded in the evidence and constituted a valid argument. The majority of the defense consisted of witnesses who attempted to convince the jury that appellant did not live with C. during the time period at issue, and that C. was a liar. In her closing argument, defense counsel vigorously emphasized that C. was "damaged" and was "famous" for making "false allegations." The prosecutor sought to focus the jury on C. and Emily's tenacity in sticking to their individual stories over the course of time and in the face of hostility aimed at them from their paternal relatives.

8

Appellant singles out the prosecutor's remark that "The defense attorney and I, we both know what happened in this case based upon everything that is generated . . . ." as if implying there was additional evidence of appellant's guilt that the jury did not get to see. Generally, a " prosecutor may not go beyond the evidence in his argument to the jury. [Citations.] To do so may suggest the existence of 'facts' outside the record—a suggestion that is hard for a defendant to challenge and hence is unfair." (*People v. Benson* (1990) 52 Cal.3d 754, 794–795.) But that is not a reasonable interpretation of the prosecutor's statement in this case. Defense counsel was premature in objecting as we note that the prosecutor was interrupted before completing her remark. Moreover, when read in context of the entire rebuttal argument, but particularly the comments immediately preceding and subsequent to defense counsel's objection, the remark does not constitute misconduct. Prior to the statement at issue here, the prosecutor talked about C. and Emily's demeanor while answering questions on direct examination and stressed how important it was that they tell their story because this was the first time the jury heard the evidence. After making the challenged statement, the prosecutor continued to emphasize that C. and Emily were truthful and stated, "I was telling you that when I asked them a question, they answered it directly. As jurors, you are hearing the information firsthand, so it's very new to you."

In preparation for trial, the prosecutor and defense attorney had heard and reviewed the evidence numerous times and had strong opinions regarding the credibility of the witnesses. The jury on the other hand was hearing the evidence for the first time and was required to make an independent determination of credibility regardless of what defense counsel or the prosecutor argued at trial. The prosecutor's comment was nothing more than a statement of their respective roles as zealous advocates for their side in the legal process and did not imply that there was specific evidence outside of the record.

For the reasons discussed herein, we also reject appellant's assertion that the prosecutor's remark implied that defense counsel was attempting to deceive the jury. Appellant points to no other remark by the prosecutor, nor has our review disclosed any,

9

that rises to the level of misconduct under either federal or state standards.  On this record, it cannot be said that the prosecutor's conduct was so egregious that it infected the trial making it fundamentally unfair or that the prosecutor used any deceptive or reprehensible methods.  The prosecutor's remarks were permissible rebuttal on the pivotal issue of witness credibility.  (*See People v. Tully* (2012) 54 Cal.4th 952, 1016; *People v. Stanley* (2006) 39 Cal.4th 913, 952.)  Appellant's claim of prosecutorial misconduct fails.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.